**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------- X

**WACHOVIA CORP.,**

        **Plaintiff,**

    **- against -**

**CITIGROUP, INC.,**

        **Defendant.**

---------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/13/09
```

**OPINION AND ORDER**

**08 Civ. 8503 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

Wachovia seeks a declaratory judgment that the merger between Wachovia and Wells Fargo in October 2008 is "valid, proper, and not prohibited" by an exclusivity agreement that was entered into by Citigroup and Wachovia prior to the merger.[1]  Citigroup has moved for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  For the reasons that follow, Citigroup's motion is denied.

---

[1]      Complaint ("Compl.") ¶ 1.

## II.   BACKGROUND[2]

### A.   The Citigroup Transaction and Wells Fargo Proposal

By the end of September 2008, the nation had witnessed the collapse

and bailout of an unprecedented number of banks and other financial institutions:

Freddie Mac and Fannie Mae, Lehman Brothers, Merrill Lynch, American

International Group ("AIG"), and Washington Mutual.[3]  The number of banks that

would require assistance, however, did not show signs of waning.

On September 29, 2008, upon finding that "the liquidation of the

insured depository institution subsidiaries of Wachovia Corporation [], as well as

the likely consequent failure of Wachovia Corporation, would have serious

adverse effects on economic conditions or financial stability and would create

systemic risk to the credit markets," the board of the Federal Deposit Insurance

---

[2]     The facts in this section are taken from the Complaint, from documents incorporated by reference in the Complaint, or from facts that are subject to judicial notice.

[3]     *See* Stephen Labaton and Edmund L. Andrews, *In Rescue to Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. Times, Sept. 7, 2008; Andrew R. Sorkin, *Lehman Files for Bankruptcy; Merrill Is Sold*, N.Y. Times, Sept. 14, 2008; Edmund L. Andrews, Michael J. Merced, Mary W. Walsh, *Fed's $85 Billion Loan Rescues Insurer*, N.Y. Times, Sept. 16, 2008 (discussing the bailout of American International Group; Eric Dash and Andrew R. Sorkin, *Government Seizes WaMu and Sells Some Assets*, N.Y. Times, Sept. 26, 2008 (discussing the seizure of Washington Mutual by federal regulators and emergency sale of its assets).

Corporation ("FDIC") voted to authorize financial assistance to facilitate

Citigroup's acquisition of Wachovia pursuant to section 13(c)(2) of the Federal

Deposit Insurance Act ("FDIA").[4]  To ensure the success of this transaction, the

board also voted to recommend that the Secretary of the Treasury invoke the

"systemic risk" provision of section 13 of the FDIA, which authorized the FDIC to

"take other action or provide assistance [] as necessary to avoid or mitigate

[serious adverse effects on economic conditions or financial stability]."[5]

    That same day, Wachovia and Citigroup entered into a non-binding

agreement-in-principle whereby Citigroup would acquire the operations of

Wachovia for approximately $2.1 billion, or $1 per Wachovia share ("Citigroup

Transaction").[6]  The FDIC informed the parties that if a transaction was not

completed by October 6, Wachovia would be forced into receivership.[7]

---

[4]     9/29/08 Minutes of The Meeting of the Board of Directors of the FDIC ("9/29/08 FDIC Board Minutes"), Ex. 3 to Declaration of Amy K. Penn, Wachovia's counsel ("Penn Decl."); Compl. ¶ 7.

[5]     *See* 9/29/08 FDIC Board Minutes; Compl. ¶ 7.  The "systemic risk" provision of Section 13 of the FDIA is codified at 12 U.S.C. § 1823(c)(4)(G)(i).

[6]     *See* Compl. ¶ 6.

[7]     *See id.* ¶ 8.

Citigroup and Wachovia also entered into an agreement that, *inter alia*, prohibited Wachovia from soliciting any acquisition proposals from third parties or entering into negotiations with any third party for the purpose of securing an acquisition proposal ("Exclusivity Agreement").[8]  The agreement was set to expire on 12:00 a.m. on October 6, 2008.[9]

In the evening of October 2, 2008, as Wachovia continued negotiations with Citigroup, Wells Fargo made an unsolicited offer to acquire Wachovia.[10]  The proposal provided that Wells Fargo would acquire all of Wachovia for $15 billion, or approximately $7 per Wachovia share ("Wells Fargo Transaction").[11]  Also, under the terms of the proposal, FDIC assistance would not be necessary.[12]  Sometime during the night of October 2, 2008, the Wachovia board approved the proposal by Wells Fargo.[13]  A definitive merger agreement

---

[8]     *See id.* ¶ 9; Exclusivity Agreement, Exhibit A to Compl.

[9]     *See* Compl. ¶ 9.

[10]    *See id.* ¶ 11.

[11]    *See id.*

[12]    *See id.*

[13]    *See id.*

4

was signed in the morning of October 3, 2008, and the merger was announced to the public prior to the opening of the markets that day.[14]

## B.     Section 126(c) of the Emergency Economic Stabilization Act

The Emergency Economic Stabilization Act ("EESA" or "the Act") was signed into law on the same day that the Wells Fargo Transaction was announced – October 3, 2008.[15]  One of the purposes of the Act is "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States."[16]  Section 126(c) of the Act provides:

> UNENFORCEABILITY OF CERTAIN AGREEMENTS
> – No provision contained in any existing or future standstill, confidentiality, or other agreement that, directly or indirectly –
> (A) affects, restricts, or limits the ability of any person to offer or acquire,
> (B) prohibits any person from offering to acquire or acquiring, or
> (C) prohibits any person from using any previously disclosed information in connection with any such offer to acquire or acquisition of,

---

[14]     *See id.*

[15]     *See* Emergency Economic Stabilization Act, Pub. L. No. 110-343, 122 Stat. 3765, 3795-96 (2008).

[16]     *Id.* § 2.

5

all or part of any insured depository institution, including any liabilities, assets, or interest therein, *in connection with* any *transaction* in which the [FDIC] *exercises* its authority under Section 11 or 13, shall be enforceable against or impose any liability on such person, as such enforcement or liability shall be contrary to public policy.[17]

Section 126(c) has since been incorporated into section 13 of the FDIA.[18]

### C.    Litigation Among Citigroup, Wells Fargo, and Wachovia

After the Wells Fargo Transaction was announced, Citigroup publicly denounced the transaction, arguing that Wells Fargo interfered with the Exclusivity Agreement and asserting that the transaction was "improper, unenforceable and prohibited by the agreement."[19]  On October 4, 2008, Citigroup filed an action against Wachovia and Wells Fargo in New York state court, alleging claims of breach of contract against Wachovia and tortious interference with contract against Wells Fargo.[20]

---

[17]    *Id.* § 126(c) (emphasis added).

[18]    *See* 12 U.S.C. § 1823(c)(11).

[19]    Compl. ¶ 12.

[20]    *See* Amended Complaint, *Citigroup Inc. v. Wachovia Corp.*, 602872/08 (Sup. Ct. N.Y.).  Although Wells Fargo and Wachovia removed the action to this Court, the case has since been remanded to state court for lack of federal jurisdiction. *See Citigroup, Inc. v. Wachovia Corp.*, — F. Supp. 2d —, 2009 WL 749864 (S.D.N.Y. Mar. 20, 2009).

That same day, Wachovia filed the instant action against Citigroup,

seeking a declaratory judgment that the Wells Fargo Transaction is "valid, proper

and not prohibited by the [Exclusivity] Agreement."[21]  Among other grounds,

Wachovia contends that section 126(c) of the EESA renders the Exclusivity

Agreement unenforceable.[22]  Citigroup now moves for partial judgment on the

pleadings under Rule 12(c), contending that section 126(c) of the EESA does not

interfere with the enforceability of the Exclusivity Agreement.

## III.   LEGAL STANDARD

### A.     Rule 12(c) Motion for Judgment on the Pleadings

"The standard for addressing a Rule 12(c) motion for judgment on the

pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to

---

[21]     Compl. Prayer of Relief.  Wells Fargo has also filed a separate but
virtually identical action for declaratory judgment against Citigroup.  *See*
Complaint, *Wells Fargo & Co. v. Citigroup Inc.*, 08 Civ. 8716.

[22]     *See* Compl. ¶ 16.  Wachovia also contends that the Exclusivity
Agreement interferes with the fiduciary obligations of Wachovia's directors to
consider, negotiate, and approve other acquisition proposals that might be superior
to the Citigroup Transaction and is therefore unenforceable under state law.  *See*
*id.* ¶ 21.

7

state a claim."[23]  "In each case, the court must 'accept[ ] as true the complaint's

factual allegations and draw[ ] all inferences in the plaintiff's favor.'"[24]

Nevertheless, the court need not accord "[l]egal conclusions, deductions or

opinions couched as factual allegations . . . a presumption of truthfulness."[25]

The allegations in a complaint must meet a standard of

"plausibility."[26]  A claim is facially plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that [plaintiff is

entitled to relief]."[27]  Plausibility "is not akin to a probability requirement;" rather

plausibility requires "more than a sheer possibility . . . ."[28]  Pleading a fact that is

"merely consistent" does not satisfy the plausibility standard.[29]

---

[23]    *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir. 2006)
(quoting *Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 113 (2d Cir. 2005)).

[24]    *Id.* (quoting *Karedes*, 423 F.3d at 113).

[25]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007)
(quotation omitted).

[26]    *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564 (2007).

[27]    *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quotation omitted).

[28]    *Id.* (quotation omitted).

[29]    *Id.* (quotation omitted).

The court "must limit itself to the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."[30]  A document is considered incorporated by reference if it is "in a pleading . . . adopted by reference elsewhere in the same pleading or in any other pleading . . . ."[31]  A court may also consider a document not specifically incorporated by reference but on which the complaint heavily relies and which is integral to the complaint.[32]  This is particularly true when the plaintiff either had the document in its possession or knew of the document when bringing suit.[33]

In addition, a court "'may [] consider matters of which judicial notice may be taken.'"[34]  The Second Circuit has held that "it is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings

---

[30]     *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[31]     Fed. R. Civ. P. 10(c).

[32]     *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 1991).

[33]     *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 217 (S.D.N.Y. 2008).

[34]     *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (quoting *Kramer*, 937 F.2d at 773).

9

contained certain information, without regard to the truth of their contents . . . ."[35]
On the other hand, if a court is presented with material outside of the pleadings
and not subject to judicial notice, it should either exclude the material in its
consideration of the motion to dismiss or consider the material after converting the
motion to dismiss into a motion for summary judgment.[36]

## B.    Statutory Construction

It is a "well-established" rule of statutory analysis that an "inquiry
begins with the plain language of the statute and 'where the statutory language
provides a clear answer, it ends there as well.'"[37] "If, however, the terms of a
statute are ambiguous, '[a court must] resort to the canons of statutory
construction to help resolve the ambiguity.'"[38] The Second Circuit has held that
"'[l]anguage is ambiguous when it is capable of more than one meaning when

---

[35]    *Id.* (citing *Global Network Commc'ns, Inc. v. City of New York*, 458
F.3d 150, 157 (2d Cir. 2006)).

[36]    *See Chambers,* 282 F.3d at 154.

[37]    *Peralta-Taveras v. Attorney General*, 488 F.3d 580, 584 (2d Cir.
2007) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

[38]    *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 368 (2d Cir.
2006) (quoting *Gottlieb v. Carnival Corp.*, 436 F.3d 335, 337 (2d Cir. 2006)).

10

viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'"[39]

"The meaning of one term may be determined by reference to the terms it is associated with, and where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated."[40]  In addition, "[t]he canons of statutory construction favor the consistent use of terms throughout a statute."[41]

"If the text of the statute itself is not clear, [] a court applying the statute may consult the legislative history to discern 'the legislative purpose as revealed by the history of the statute.'"[42]  Additionally, "courts, in construing a statute, may with propriety recur [sic] to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as

---

[39]     *Id.* (quoting *O'Neil v. Retirement Plan for Salaried Employees of RKO, Inc.*, 37 F.3d 55, 59 (2d Cir. 1994)).

[40]     *General Elec. Co. v. Occupational Safety and Health Review Comm'n*, 583 F.2d 61, 65 (2d Cir. 1978).

[41]     *Schneider v. Feinberg*, 345 F.3d 135, 146 (2d Cir. 2003).

[42]     *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 627 (1993)).

11

the meaning of particular provisions in it."[43] "'[W]here . . . examination of [a]

statute as a whole demonstrates that a party's interpretation would lead to absurd

or futile results . . . plainly at variance with the policy of the legislation as a whole,

that interpretation should be rejected.'"[44]

## C.    Retroactivity

> When a case implicates a federal statute enacted after the
> events in suit, the court's first task is to determine whether
> Congress has expressly prescribed the statute's proper
> reach. If Congress has done so, [] there is no need to resort
> to judicial default rules.    When, however, the statute
> contains no such express command, the court must
> determine whether the new statute would have retroactive
> effect, *i.e.*, whether it would impair rights a party possessed
> when [it] acted, increase a party's liability for past conduct,
> or impose new duties with respect to transactions already
> completed.  If the statute would operate retroactively, our
> traditional presumption teaches that it does not govern
> absent clear congressional intent favoring such a result.[45]

## IV.   DISCUSSION

### A.    Statutory Language

---

[43]    *Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979).

[44]    *City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 401 (2d Cir. 2008) (quoting *Yerdon v. Henry*, 91 F.3d 370, 376 (2d Cir. 1996)).

[45]    *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

Both parties argue that the language of section 126(c) supports their respective positions. Citigroup contends that Congress' use of certain terms and phrases in section 126(c) of the EESA makes clear that the provision only applies to render unenforceable agreements that hinder third parties from making offers to acquire a bank when the transaction of such parties is assisted by the FDIC pursuant to section 13 of the FDIA.[46] In other words, Citigroup asserts that the "offer to acquire" must be "in connection with" a "transaction in which the FDIC exercises its authority." Because the Wells Fargo Transaction was not assisted by the FDIC, section 126(c) does not apply.[47]

Citigroup further contends that although the Citigroup Transaction was assisted by the FDIC, section 126(c), by its terms, does not apply to the Exclusivity Agreement that was entered into for the benefit of the Citigroup Transaction. Citigroup asserts that the use of the present tense in "exercises" indicates that section 126(c) "protects only those bank acquisitions that are in connection with a contemporaneous exercise of § 11 or § 13 authority by the

---

[46]    *See* Memorandum of Law in Support of Citigroup Inc.'s Motion for Partial Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c) ("Citigroup Mem.") at 8-12.

[47]    *See id.*

13

FDIC."[48]  Because the FDIC had already *exercised* its authority under section 13
by offering to give assistance to the proposed Citigroup Transaction, Citigroup
argues that the "transaction" in section 126(c) cannot refer to the Citigroup
Transaction.[49]

Moreover, Citigroup contends that Wells Fargo's offer to acquire or
acquisition cannot be "in connection with" a transaction in which the FDIC
exercises section 13 authority because the phrase "in connection with" in section
126(c) should be read consistently with use of the same phrase in securities law,
where it indicates a causal relationship.[50]  Citigroup therefore contends that the
inclusion of "in connection with" in section 126(c) indicates that "the offer to
acquire or acquisition must be an integral part of the process leading to the
transaction in which the FDIC exercises its § 11 or § 13 authority."[51]  Because the
Wells Fargo Transaction had no FDIC assistance, but rather followed a
commitment of FDIC assistance to a different entity, the "transaction" referred to
in that provision cannot be the Wells Fargo Transaction.

---

[48]     *See id.* at 8.

[49]     *See id.*

[50]     *See id.* at 10.

[51]     *Id.*

14

Finally, Citigroup argues that the term "transaction" cannot refer generally to the sale of Wachovia and must instead refer to a "specific deal" because the "FDIC cannot perform its duties under this section except in the context of a specific deal."[52]  As a result, if section 126(c) is referring to *any* transaction between Wachovia and either of the two acquirer banks, Citigroup maintains, it must be referring to the Citigroup Transaction.

Wachovia does not dispute that the Citigroup Transaction was the only transaction that received approval of FDIC assistance pursuant to section 13 of the FDIA.[53]  Nevertheless, Wachovia contends that the FDIC exercised its authority pursuant to section 13 not only when the FDIC offered assistance to the Citigroup Transaction, but also throughout the process as it facilitated the competitive bidding of Wells Fargo and Citigroup over Wachovia.[54]  Thus, Wachovia contends, the "transaction" referred to in section 126(c) is not merely the Citigroup Transaction, but is "extended to the entire FDIC-supervised 'transaction' in which the Wachovia crisis was resolved by a sale to Wells

---

[52]     *Id.* at 12.

[53]     *See* Memorandum of Law in Opposition to Citigroup, Inc.'s Motion for Partial Judgment on the Pleadings ("Wachovia Mem.") at 8 (noting that the Wells Fargo Transaction required no government assistance).

[54]     *See id.* at 10-14.

15

[Fargo]."[55]  Consistent with this interpretation, Wells Fargo's offer to acquire or

acquisition is undoubtedly "in connection with" a sale of Wachovia, and therefore

section 126(c) applies.

Wachovia argues alternatively that even if this Court takes a narrow

view of "transaction," concluding that this term applies only to the Citigroup

Transaction, the Court should nevertheless interpret the phrase "in connection

with" broadly.[56]  Wachovia argues that an interpretation of "in connection with" to

mean "some relationship or association" would be consistent with case law and

dictionary definitions.[57]  Because "the Exclusivity Agreement unquestionably had

the effect of limiting other offers 'in connection with' [the Citigroup

Transaction]," it "falls squarely within § 126(c)'s reach."[58]

--------

[55]    *Id.* at 10.

[56]    *See id.* at 14-16.

[57]    *Id.* at 15 (citing *United States v. Loney*, 219 F.3d 281, 284 (3d Cir.
2000) ("[T]he phrase 'in connection with' expresses some relationship or
association . . . that can be satisfied in a number of ways such as a causal or logical
relation or other type of relationship."); American Heritage Dictionary 390 (4th ed.
2000) (defining "connection" as "an association or relationship")).

[58]    *Id.* at 2.  Wachovia also notes that section 126(c) can be read another
way – instead of the phrase "in connection with" modifying the "offer to acquire,"
the phrase "in connection with" may also modify "provision" or "agreement."  *See*
Wachovia Mem. at 15 n.4.  If section 126(c) is read this way, any provision or
agreement in connection with a transaction in which the FDIC exercises its
authority would be unenforceable.  Wachovia argues that this reading would also

As a preliminary observation, Wachovia does not dispute that the

"transaction" referred to in section 126(c) is one in which the FDIC *exercises*

section 13 authority. The difference in interpretations stems from the divergent

meanings the parties ascribe to two key terms – "transaction" and "in connection

with." I must therefore resolve this disagreement in order to rule on this motion.

Citigroup observes that the term "transaction" exists elsewhere in

section 13 of the FDIA, and that an examination of its uses indicates that

"transaction" must refer to a specific deal.[59] For instance, Citigroup notes that

under the least-cost provision of section 13, "the FDIC must assess '[f]ederal tax

revenues that the Government would forego as the result of a proposed *transaction*

. . . .'"[60] Citigroup argues that the FDIC cannot determine tax revenues without an

"identifiable" transaction.[61] Citigroup also points to the use of the term

---

support its position because section 126(c) would prevent the Exclusivity
Agreement entered into for the purpose of the Citigroup Transaction from being
enforced. *See id.*

[59]     *See* Citigroup Mem. at 11.

[60]     *Id.* at 12 (quoting 12 U.S.C. § 1823 (c)(4)(E)(iii)) (emphasis in
original).

[61]     *Id.*

17

"transactions" in "Purchase and assumption *transactions*," the heading of section
1823(c)(4)(E)(iii).[62]

Citigroup also argues that in a section 1823 note, Congress had
provided that "'the *transaction* [in which the FDIC rescues a troubled bank]
should involve substantial private investment'"[63] and that "'the [same] *transaction*
should give the [FDIC] an opportunity to participate in the success of the resulting
institution.'"[64]  Finally, Citigroup notes that Congress also provided that "'[t]he
*transaction* should be *negotiated competitively*'" and argues therefore that the
"transaction results from the competitive negotiation; it is not negotiation itself."[65]

While Citigroup is correct that terms should be presumed to share a
meaning when they appear in the same section of a statute, Citigroup fails to
explain why the term "transaction" cannot refer generally to the competitive sale
of Wachovia.  As Wachovia explains, section 1823(c)(4)(B)(ii) – which refers to

---

[62]    *See id.*

[63]    *See* Reply in Support of Citigroup Inc.'s Motion For Partial Judgment
on the Pleadings Under Federal Rule of Civil Procedure 12(c) ("Citigroup Rep.")
(quoting 12 U.S.C. § 1823 Note, Early Resolution of Troubled Insured Depository
Institutions ("Section 1823 Note"), § 143(b)(3) (1991)) (emphasis in original).

[64]    *See id.* (quoting Section 1823 Note, § 143(b)(6)) (emphasis in
original).

[65]    *See id.* (quoting Section 1823 Note, § 143(b)(1)) (emphasis in
original).

18

foregone tax revenues – does not require an identifiable purchaser, but only directs

the FDIC to assess tax revenues foregone as the result of the accrual of tax-

deductible losses to the entity that ultimately purchases Wachovia.[66]  In addition,

the heading of section 1823(c)(4)(E)(iii) says nothing about the meaning of

"transaction."[67]  The same could be said of the use of "transaction" in the section

1823 note.  Congress was merely providing that the sale of a failing bank should

include "substantial private investment," should "give the [FDIC] an opportunity

to participate in the success of the resulting institution," and should be

competitively negotiated.

At most, the use of the word "transaction" in these provisions

suggests the unremarkable proposition that the word "transaction" is qualified by

the words surrounding it.[68]  Applying this statutory rule to section 126(c), the word

"transaction" refers to a transaction "in which the FDIC exercises its authority

under section [] 13."[69]  Thus, in order to define "transaction," I must determine

when the FDIC exercises its authority.

---

[66]     *See* Wachovia Mem. at 13.

[67]     *See id.* at 13-14.

[68]     For example, "*proposed* transaction" and "*purchase and assumption* transactions."

[69]     12 U.S.C. § 1823(c)(11).

At oral argument, Citigroup argued that section 1823(c)(2)(A)(iii)

was the authority that the FDIC had exercised with respect to the Citigroup

Transaction.[70] That section states:

> In order to facilitate a merger or consolidation of an
> insured depository institution [which is in danger of default
> or which threatens the stability of a significant number of
> institutions] with another insured depository institution [],
> the Corporation is authorized, in its sole discretion and
> upon such terms and conditions as the Board of Directors
> may prescribe to guarantee such other insured depository
> institution or the company which controls or will acquire
> control of such other insured depository institution against
> loss by reason of such insured institution's merging or
> consolidating with or assuming the liabilities and
> purchasing the assets of such insured depository institution
> or by reason of such company acquiring control of such
> insured depository institution.

Thus, Citigroup contends, the FDIC exercised its authority pursuant to section 13

of the FDIA when it voted to provide assistance in the form of a guarantee to the

Citigroup Transaction.

However, read strictly, the provision appears to indicate that the

FDIC exercises its authority when it *actually* provides assistance – in this case,

when it guarantees the acquirer's losses. Although the FDIC had *approved* such

---

[70]     *See* Transcript of 3/17/09 Oral Argument ("Tr.") at 45:11-17
(responding to the Court's question about how the FDIC exercises its authority
under Section 13).

assistance on September 29, 2008, the guarantee would not have been put in place until after Citigroup and Wachovia had consummated the transaction in a binding agreement. Such agreement had not been signed by the time Wells Fargo made its offer. Citigroup's position therefore finds no support in this provision.

In addition, although Citigroup discusses the FDIC's exercise of authority to provide financial assistance to the Citigroup Transaction, it fails to mention that the FDIC may also exercise authority pursuant to the "systemic risk" provision of section 13, which was invoked by the Secretary of the Treasury upon the recommendation of the FDIC. The "systemic risk" provision allows the FDIC to act contrary to its "least-cost" obligations under section 13, which require the FDIC to provide financial assistance only when it has determined that the assistance is the least costly of all possible methods for protecting a bank against the possibility of default.[71] Invocation of the "systemic risk" provision by the Secretary of the Treasury permits the FDIC to "take other action or provide assistance [] as necessary to avoid or mitigate [adverse effects on economic conditions or financial stability]."[72]

---

[71]   *See* 12 U.S.C. § 1823(c)(4)(A)(ii).

[72]   *Id.* § 1823(c)(4)(G)(i).

21

Citigroup contends that the declaration of systemic risk was made specifically in connection with the Citigroup Transaction.[73]   Indeed, the board of the FDIC recommended the invocation of this provision during the same meeting that it approved the provision of financial assistance to the Citigroup Transaction.[74]   However, when the systemic risk provision is read together with the least-cost resolution requirement, it becomes plain that the FDIC's priority was not the sale of Wachovia to Citigroup but the rescue of Wachovia using any necessary means.   Interpreted in this way, the FDIC's exercise of authority pursuant to section 13 encompasses not only its guarantee of the Citigroup Transaction but also its participation in a broad range of actions necessary to rescuing Wachovia, including conducting a competitive sale of Wachovia.

Once it is established that the competitive sale of Wachovia was a "transaction in which the FDIC exercises its authority," then there is no need to define the breadth of the phrase "in connection with."   There is no doubt that Wells Fargo's offer to acquire or acquisition was "in connection with" a sale of Wachovia, and therefore section 126(c) applies to render the Exclusivity Agreement unenforceable.

---

[73]     *See* Tr. at 25:8-9.

[74]     *See* 9/29/08 FDIC Board Minutes.

22

## B.    Purpose of Section 126(c)

The application of section 126(c) to this case is also consistent with

its purpose.  Consistent with the name of the statute, one of the purposes of the

EESA is to "immediately" provide the "authority and facilities that the Secretary

of the Treasury can use to restore the liquidity and stability to the financial system

of the United States."[75]  Section 126(c) was likely incorporated into section 13 of

the FDIA in order to accord the FDIC the authority to aid the Secretary of the

Treasury in achieving such liquidity and stability by removing obstacles to bank

consolidation.

The provision's purpose may also be gleaned from an examination of

the historical context surrounding the enactment of the EESA.[76]  In the weeks

leading to the enactment of the EESA, Lehman Brothers had been forced into

bankruptcy, Merrill Lynch was sold to Bank of America, Fannie Mae and Freddie

Mac were seized and subsequently controlled by the Treasury Department, and

AIG received a bailout from the federal government.  At the end of September

---

[75]     EESA § 2.

[76]     The parties agree that no legislative history accompanies section
126(c).  See Tr. at 22:19-23:5.

23

2008, Washington Mutual's bank subsidiary was put into FDIC receivership and involuntarily sold to J.P. Morgan Chase.

There is no dispute that the nation was confronted by an alarming banking crisis. The EESA was enacted on October 3 in this economic climate. Read with this historical context in mind, section 126(c)'s purpose was to give the FDIC the full flexibility to rescue troubled banks.

Citigroup agrees that the purpose of section 126(c) was to afford the FDIC significant discretion, but argues that the provision applies only to the benefit of those bidders participating in an FDIC-assisted bank rescue.[77] Citigroup asserts that Congress did not intend to permit "a virtually endless form of open bidding to displace an FDIC-engineered rescue."[78] In other words, Citigroup argues that allowing a non-FDIC supervised transaction to interfere with the progress of an FDIC-supervised transaction would conflict with the purpose of section 126(c).[79]

---

[77]     *See* Citigroup Mem. at 13.

[78]     *Id.*

[79]     *See id.* at 14 ("Nothing in the events preceding the enactment of § 126(c) suggests that Congress sought to expand opportunities for deal-jumpers to emerge after an FDIC rescue and displace the transaction selected by the FDIC.").

It would be unreasonable indeed to interpret section 126(c) in a way that would allow a non-FDIC-supervised transaction to interfere with one that is engineered by the FDIC. Nonetheless, when the term "transaction" in section 126(c) is interpreted to refer to the sale of Wachovia, Citigroup's reasoning loses much of its power. Read in this way, the Wells Fargo Transaction was part of an FDIC-supervised rescue and therefore was permitted to benefit from section 126(c).

Citigroup proffers a number of arguments in support of its belief that Congress wished to preserve deal protections in FDIC-assisted transactions. *First*, Citigroup notes that "[t]he government did not need § 126(c) to keep deal protection mechanisms out of FDIC-assisted transactions. The FDIC could simply decline to support a transaction involving such provisions, or condition approval on their deletion, if they would disserve the public interest."[80] However, the fact that the FDIC supported the Citigroup Transaction notwithstanding the Exclusivity Agreement and that it failed to condition approval of the Citigroup Transaction on its deletion says nothing about its approval of the Exclusivity Agreement itself. In addition, section 126(c) is necessary because in its absence, bidders who participate in an FDIC-supervised transaction would be subject to

---

[80]    *Id.*

liability pursuant to an Exclusivity Agreement arising out of a non-FDIC-supervised transaction.

*Second*, Citigroup contends that Congress did not intend for section 126(c) to render unenforceable exclusivity agreements in FDIC-assisted transactions because doing so "would make it more difficult for the FDIC to arrange successful rescues of failing banks."[81]  This argument is also unpersuasive. Citigroup overlooks that this interpretation would prevent the FDIC from agreeing to a subsequent, more attractive proposal.  Citigroup's reading would make it more difficult for the FDIC to arrange a successful rescue.

*Third*, Citigroup asserts that reading section 126(c) to bar deal protections in FDIC-assisted transactions would discourage future bidders from making proposals to rescue failing banks.[82]  However – as Citigroup itself suggested – the FDIC has the power to prevent a future bidder from interfering with a transaction that it prefers.  Other regulatory bodies – whose approval is

---

[81]    *Id.* at 15.

[82]    *See id.* at 15-16.

26

required for the merger or acquisition of banking institutions – could also refuse to approve a less favorable transaction.[83]

### C.   Application of Section 126(c) to Wachovia

Having decided that section 126(c) applies to render the Exclusivity Agreement unenforceable, I turn to the next question: Is the Exclusivity Agreement unenforceable with respect to Wachovia?

Neither party disputes that the text of section 126(c) supports its application to protect subsequent bidders from liability. Subdivision (A) speaks of "the ability of any person to offer to acquire or acquire," and subdivision (B) discusses any person who is "offering to acquire or acquiring."[84] Later, the provision provides that no limiting agreement "shall be enforceable against or impose any liability on *such person*."[85] When read as a whole, "such person" must

---

[83]     This would eliminate the unattractive scenarios that Citigroup projects – for instance, when a subsequent bidder is less financially sound than a bidder that the FDIC supports; when the subsequent bidder's proposal requires more taxpayer money; and when a subsequent bidder must rely on monetary assistance from the federal government to effect a merger transaction. *See id.* at 18.

[84]     12 U.S.C. § 1823(c)(11).

[85]     *Id.* (emphasis added).

refer back to subdivision (A) and (B) to implicate parties that offer to acquire or are acquiring – in other words, bidders and acquirers.[86]

However, Congress also included a phrase at the end of the provision, explaining that enforcement of agreements such as standstill, confidentiality, and exclusivity agreements against subsequent bidders and the imposition of liability on those parties would be "contrary to public policy."[87]  Congress clearly meant to exempt subsequent bidders or acquirers from penalties for interfering with a transaction that is protected by an agreement such as the Exclusivity Agreement at issue here.

Because Wells Fargo acquired all of Wachovia, imposing liability on Wachovia would be equivalent to penalizing Wells Fargo.  For instance, a remedy of specific performance would invalidate the Wells Fargo Transaction, thereby injuring not only Wachovia, but also Wells Fargo.  A judgment invalidating the Wells Fargo Transaction would have the same effect.  Any imposition of contract

---

[86]     Subdivision (C) is more ambiguous and discusses a person that is "using any previously disclosed information in connection with any such offer to acquire."  12 U.S.C. § 1823(c)(11)(C).  The "person" referred to here could theoretically include an acquiree.  However, when subdivision (C) is read in conjunction with the other subdivisions, it is most plausible to interpret that subdivision to also refer to acquirers.

[87]     12 U.S.C. § 1823(c)(11).

damages on Wachovia would effectively be an imposition of damages on Wells

Fargo.  Interpreting the provision in this way would defeat the purpose of section

126(c) and produce an absurd result.[88]  I therefore find that section 126(c) renders

the Exclusivity Agreement unenforceable with respect not only to Wells Fargo,

but also Wachovia.

### D.    Retroactivity

Finally, Citigroup contends that the EESA "should not be read to

retroactively immunize conduct that preceded EESA's enactment."[89]  As noted, the

EESA was enacted on October 3, 2008 – after the Exclusivity Agreement was

signed and after Wells Fargo submitted its bid.

Citigroup concedes that "Congress does appear to have prescribed

one retroactive effect in saying that some provisions in 'existing' contracts shall

---

[88]      Citigroup argues that while Wells Fargo assumed all of Wachovia's
liabilities, there may be other transactions in which an acquirer will only partially
assume the liabilities of an acquiree.  In those cases, the text would not lead to an
absurd result. *See* Citigroup Rep. at 6.  Although I find that it is proper to apply
section 126(c) to protect Wachovia from liability in this case, I do not make any
assessment regarding the factual scenarios provided by Citigroup.  However, I do
note that even in a partial acquisition, although a remedy of specific performance
would still injure a subsequent bidder by invalidating its acquisition of a target,
the imposition of contract damages on the target would not penalize the acquirer.
I leave this question for another court on another day.

[89]      Citigroup Mem. at 19.

not be enforceable."[90] Nevertheless, Citigroup asserts that at the time of the
EESA's enactment, a cause of action for breach of contract and tortious
interference with contract had already accrued.[91] It argues that Wachovia's
construction of section 126(c) would have the retroactive effect of extinguishing
causes of action that accrued prior to the EESA's enactment.[92]

However, Citigroup cannot escape the conclusion that Congress
intended for the provision to apply retroactively because the provision expressly
applies to "existing" contracts. In addition, section 126(c) impairs the
*enforceability* of the Exclusivity Agreement. Even if it is true that Citigroup's
cause of action accrued prior to the EESA's enactment, there is no dispute that
Citigroup brought its *enforcement* action on October 4 *after* the enactment of the
statute. Section 126(c) therefore properly applies to bar enforcement of the
Exclusivity Agreement.[93]

---

[90]     *Id.* at 20.

[91]     *See id.*

[92]     *See id.*

[93]     There may be constitutional concerns with respect to applying section
126(c) to render the Exclusivity Agreement unenforceable. However, the parties
have agreed that those constitutional issues will be the subject of a subsequent
motion. I therefore do not address them here.

## V.     CONCLUSION

For the reasons stated above, Citigroup's motion pursuant to Rule

12(c) for judgment on the pleadings is denied. The Clerk of the Court is directed

to close this motion (document no. 76). A status conference is scheduled for July

22, 2009 at 3:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           July 13, 2009

31

## - Appearances -

### For Wachovia:

Eric Seiler, Esq.
Bruce S. Kaplan, Esq.
Andrew W. Goldwater, Esq.
Daniel B. Rapport, Esq.
Jeffrey C. Fourmaux, Esq.
L. Reid Skibell, Esq.
Jessica L. Richman, Esq.
Amy K. Penn, Esq.
Friedman, Kaplan, Seiler and Adelman
1633 Broadway
New York, NY 10019
(212) 833-1100

### For Citigroup:

Gregory P. Joseph, Esq.
Pamela Jarvis, Esq.
Douglas J. Pepe, Esq.
Gregory P. Joseph Law Office LLC
485 Lexington Ave
New York, NY 10017
(212) 407-1228

Paul A. Engelmayer, Esq.
Noah Adam Levine, Esq.
Wilmer, Cutler, Hale & Dorr, L.L.P.
399 Park Avenue
New York, NY 10022
(212) 230-8889